# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| SHEDERICK WHIPPLE, D.M.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 3:13-CV-1177 |
| | ) | |
| TAYLOR UNIVERSITY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the court for resolution of several pending motions. The Defendant, Taylor University, filed a motion for summary judgment and supporting memorandum (DE 41, 42). The Plaintiff, Shederick Whipple, filed a response and supporting memorandum in opposition to the motion (DE 56, 57), and Taylor filed a reply brief (DE 62). After seeking leave of court to do so, Whipple filed a sur-response (DE 73) and Taylor filed a sur-reply (DE 75). In addition, Whipple filed two motions to strike (DE 58, 67) and Taylor filed one motion to strike (DE 61). For the reasons discussed below, the Defendant's motion for summary judgment (DE 41) is: DENIED as to the issue of the timeliness of the Plaintiff's claims; GRANTED as to the Plaintiff's race discrimination claim; and DENIED as to the Plaintiff's retaliation claim. The Plaintiff's first motion to strike (DE 58) is MOOT; the Defendant's motion to strike (DE 61) is GRANTED in part and DENIED in part; and the Plaintiff's second motion to strike (DE 67) is MOOT.

# BACKGROUND[1]

Shederick Whipple began working at Taylor University in August 2006 as an Assistant Professor of Music. Complaint (DE 1), p. 2, ¶ 9. Whipple's professorship was a seven-year tenure track position. *Id*. In his Complaint, Whipple, an African-American, alleges that he experienced "a continuing pattern of severe and pervasive harassment on the basis of his race . . . ." *Id*., ¶ 11. For example, Whipple claims that while he was visiting the campus in April 2006, another professor told him that "the blacks who move here don't get involved in the culture, they don't like it and they leave and it's their fault." *Id*., ¶ 12. During that same visit, Whipple claims, another faculty member asked him "what would make you want to come here and be with all these white people?" *Id*. Whipple also alleges that he "began experiencing problems with Dr. Patricia Robertson, a colleague in the Music Department, during [Whipple's] first semester with the University." *Id*., ¶ 13. Whipple states that he felt "underutilized" in his job and that Robertson told him that the only reason he was hired by the University was because he was black. *Id*. Whipple alleges that Robertson told students that the only reason Whipple was on the faculty was because of his race. *Id*., ¶ 14. On October 15, 2010, Whipple applied for promotion from Assistant Professor to Associate Professor. *Id*., ¶ 16. A few weeks later, "[o]n November 5, 2010, Dr. Whipple filed a written complaint of race harassment against Dr. Robertson. *Id*., ¶ 17.  On February 21, 2011, his application for promotion was denied "citing issues of collegiality related

---

[1] Both parties challenge the admissibility of much of the evidence in this case. These challenges, set forth in the parties' respective motions to strike, are discussed below. The court's recitation of the background facts of this case–taken from Whipple's Complaint–includes mention of some facts that are based on challenged evidence. Those facts are included here for purposes of completeness and context, although not all of that evidence will be considered when the court addresses the merits of Taylor's motion for summary judgment.

to [his] complaints regarding race based issues with Dr. Robertson and others." *Id*., ¶ 17. Whipple

"successfully appealed the denial of his promotion; however, he experienced retaliation and

continued race related issues throughout the year." *Id*., ¶ 18. On October 7, 2011, Whipple filed a

charge of discrimination with the EEOC, "alleging race discrimination and retaliation based on

the foregoing acts." *Id*., ¶ 19. Whipple claims that "on . . . January 17, 2012, Dr. [Albert]

Harrison, Music Department Chair, . . . noted that Dr. Whipple was entering the year in which his

tenure application process would occur. Dr. Harrison noted several issues that would need to be

addressed in the tenure review process[.]" and that "[a]mong the items to be addressed were Dr.

Whipple's 'feelings about Taylor related to racism[.]'" *Id*., ¶ 21. Whipple's application for tenure

was denied on July 30, 2012, and he contends it was "because of his race and/or his previous

complaints of race discrimination." *Id*., ¶ 22. It is undisputed that "[i]n conjunction with denial of

tenure, the University did not renew Dr. Whipple's contract thereby ending his employment at the

conclusion of the 2012-2013 academic year." *Id*., ¶ 23. Whipple brought this action alleging that

Taylor discriminated against him, in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq*., on the basis of his race and in retaliation for his complaints about

discrimination. Additional background facts will be discussed as they become relevant to the

court's discussion and analysis.

     In its memorandum in support of its motion for summary judgment, Taylor contends that

"in the eyes of Taylor, Whipple failed to appropriately address his collegiality and student conflict

resolution issues by the time of his tenure application and as a result Taylor denied Whipple's

tenure application. Taylor's decisions with respect to Whipple's employment were based on

legitimate, non-discriminatory reasons and were in response to Whipple's history of conflicts with

students and colleagues, his refusal to humbly admit mistakes, and his failure to adhere to the principles of Taylor's Life Together Covenant, i.e., his lack of collegiality." [2] Defendant's Memorandum, p. 1. Taylor argues that it is entitled to summary judgment because 1) "[m]any of the actions about which Whipple now complains are untimely . . ." and 2) Whipple fails to present sufficient admissible evidence to establish a *prima facie* case of discrimination or retaliation. *Id.*, generally.

## STANDARD OF REVIEW

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the

---

[2] The Life Together Covenant, essentially a canon of the University, is defined in Taylor's Faculty Handbook as ". . . a covenant community of Christians . . . intentionally joining together for academic progress, personal development, and spiritual growth." Defendant's Response (DE 42-3, p. 17) (ellipses in original). The Faculty Handbook then states that "to maintain such an environment, it is imperative that all faculty members demonstrate a cooperative spirit with colleagues . . ." and that "Department chairs and School deans are responsible for ensuring a spirit of collegiality in individual departments and schools." *Id.* This matter of collegiality, and its inclusion in Taylor's LTC (to which all faculty members are expected to adhere), is an important point in this case, since it is the nondiscriminatory reason that Taylor proffers to explain its decision to deny Whipple tenure.

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

Courts must also be mindful "that employment discrimination cases typically involve questions of intent and credibility," and resolution of those issues is the sole province of the jury. *Alexander v. Wisc. Dep't of Health and Family Svcs.*, 263 F.3d 673, 681 (7th Cir. 2001). Weighing evidence and making credibility decisions are jury functions, and it is not appropriate for a judge to assume those functions when ruling on a motion for summary judgment. *Anderson,* 477 U.S. at 255. Accordingly, the court "'appl[ies] the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on issues of intent and credibility.'" *Bob-Maunuel v. Chipotle Mexican Grill, Inc.*, 10 F. Supp. 3d 854, 873 (N.D. Ill. 2014) (quoting *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002)).

**I. Motions to Strike.**

### A. Plaintiff's first motion to strike (DE 58).

Before turning to the merits of Taylor's motion for summary judgment, the court must address the disputes raised in the three motions to strike, which are legion. In the first such motion, Whipple seeks to exclude the following evidence submitted by Taylor:

1) paragraph three of the affidavit of Eugene Habecker, the President of Taylor University (*see* Defendant's Exhibit 1 (DE 42-3, p. 2[3])), which Whipple argues contains irrelevant hearsay evidence (and which contains a description of Taylor's efforts over the years to increase diversity at the University);

2) paragraph 4(a) of Habecker's affidavit, which Whipple claims is irrelevant (and which contains a summary of Habecker's personal history of supporting diversity in academia);

3) paragraph 4(c) of Habecker's affidavit on the grounds that it is inadmissible hearsay (and which contains more about Habecker's professional efforts to encourage diversity);

4) paragraph 1 of Defendant's Exhibit 1(b) (DE 42-5, pp. 23-24), which Whipple claims is irrelevant (and which is a portion of the Taylor Faculty Handbook section pertaining to tenure procedures);

5) "[a]ny statements in the Defendant's exhibits or brief, that repeat what Dr. [Stephen] Bedi claims Pastor [Tom] Ballard told him . . ." because these statements are "inadmissible

---

[3] All page numbers cited by the court, whether referring to pages in briefs or pages in exhibits, are the page numbers assigned by the court's electronic docketing system at the time a document is filed (and which appear in the upper right corner of each page). These page numbers may not always coincide with the original ones appearing on each document.

double hearsay[]" (which statements concern an incident that occurred off campus on September 13, 2011, during which Whipple allegedly threatened a female student);

6) the Defendant's document 42-5, p. 350, which Whipple contends is inadmissible hearsay (and which contains an unsigned, undated statement claiming that several other professors allegedly had conflicts with Robertson due to her "overbearing nature"); and,

7) paragraphs three, 16 and 17 of the affidavit of Stephen Bedi, Professor of Higher Education and Provost Emeritus of Taylor University, which Whipple claims contain inadmissible hearsay (and which summarize those third-party statements made to Bedi regarding the incident between Whipple and the student).

Plaintiff's motion to strike, pp. 1-4.

All of the evidence Whipple seeks to exclude by way of this motion is evidence related to the racial make-up of Taylor's student body and faculty, evidence of Taylor's purported efforts to increase that diversity, and statements made about Whipple that pertain to his alleged lack of collegiality (such as the statements memorialized in Bedi's affidavit and report). According to Taylor, the evidence at issue was submitted–and is admissible–because it demonstrates that the University had no racial animus when it denied Whipple's tenure application and refused to renew his contract. Taylor also opposes Whipple's motion by arguing that many of the statements he seeks to exclude are not hearsay because they are not being offered to prove the truth of the matter asserted. For example, with regard to the statements about the off-campus confrontation, Taylor points out that Pastor Ballard reported the allegations to Habecker, who instructed Bedi to investigate. *See* Bedi Affidavit (DE 42-7), ¶ 16. Taylor contends that the fact that Ballard reported the allegations, thereby triggering an investigation and report, is not being offered to prove the

truth of those allegations, but rather as evidence of Taylor's "state of mind" when it made employment related decisions concerning Whipple. Defendant's Response (DE 59), p. 5. This is just one example of the many, very specific items of evidence that the parties are battling over in their motions to strike.

As to items 1-3 above, Whipple argued in his brief in opposition to the motion for summary judgment that "[t]here is evidence that the Defendant's decision to deny Whipple tenure was part of an ongoing discriminatory pattern and practice at the Upland, Indiana campus. During Dr. Whipple's employment, the University employed an extremely low percentage of blacks compared to non-black/non-African American individuals." Plaintiff's Response, p 10. Taylor retorts by presenting the statistical evidence that Whipple seeks to preclude. Defendant's Reply, pp. 1-2. Taylor states that "[t]he racial make-up of Upland, Indiana, is 1.6% Black[.]" and that during the "2012-13 academic year: Taylor's employees and academic faculty were 2.2% Black and 5.2% minority[.]" *Id.*, p. 1. Taylor then presents the additional statistical and anecdotal evidence in Habecker's affidavit to demonstrate Habecker's efforts over the years, at Taylor and other institutions, to increase diversity. Habecker Aff., generally. Finally, Whipple argues that the evidence Taylor submitted to refute Whipple's allegation that there was a pattern and practice of racial animus at Taylor should be stricken because it "fails to distinguish or even address whether this increase involved increased enrollment by people within Dr. Whipple's racial category (Black/African-American) as opposed to only members of other racial minorities that historically have not been discriminated against as severely or as for as long as [sic] African-Americans in this country." Plaintiff's First Motion to Strike, p. 1. In further support of his argument to strike Taylor's rebuttal evidence on this issue, Whipple provides a commentary about the history of

racial discrimination in America. Whipple states as follows:

> The Civil War, for example, was not fought in part to free Hispanics or Asians from slavery, but Black/African-Americans. Jim Crow laws, for example, were enacted to limit and minimize the rights of primarily Black/African-Americans, not Hispanics or Asians. Even as recently as the 50s [sic], it was not Asians and Hispanics that had to protest being required to ride on the back of busses, but Blacks/African-Americans. The uncorroborated and unverifiable statistical reference by Habecker should therefore be stricken from the record.

*Id*., pp. 1-2. It is at this point that the argument over the racial make-up of Taylor's student body and faculty flies off the rails. Obviously, Whipple is implying that the low percentage of black students and faculty members at Taylor supports his race claim, since it reveals what he concludes is a pattern of racial animus towards blacks. Whipple claims the statistical data presented by Taylor in response to his allegations about the racial make-up of the University, is "uncorroborated and unverifiable" and should be stricken for those reasons. He supports his own argument not with corroborated, verified statistical evidence of his own, but rather with the above one-paragraph history lesson about the Civil Rights movement in the United States. In short, Whipple observes that the number of African-American students and faculty members at Taylor is low, which he apparently believes forms a basis on which the court can draw an inference of discriminatory intent. Then, when Taylor responds by presenting evidence of its efforts (and Habecker's) to increase diversity, Whipple wants the court to ignore it. Unfortunately, the issues raised in Whipple's motion to strike are taking us down a dirt road when we should be on the interstate.

Evidence of the racial make-up of a defendant employer is generally only relevant (and, in fact, is part of a *prima facie* case) in disparate treatment cases. *See, e.g.*, *Armstrong v. City of Milwaukee*, 2005 WL 3088445, at *4 (E.D.Wis. 2005) ("In a pattern and practice disparate

treatment case, statistical evidence constitutes the core of a plaintiff's *prima facie* case.") (citing *Bell v. E.P.A.*, 232 F.3d 546, 553 (7th Cir. 2000)). That said, statistical evidence can also be used in harassment cases as evidence of pretext, which is the reason Whipple is attempting to use such evidence. *See id.*, 2005 WL 3088445, at *4 ("evidence of 'systemic disparate treatment is relevant to and probative of the issue of pretext even when it is insufficient to support a pattern and practice disparate treatment case.'") (quoting *Bell*, 232 F.3d at 553). The plaintiff in *Armstrong* did the same thing, presenting statistical evidence demonstrating that there was a low percentage of African-Americans employed by the defendant, and alleging that this fact was "clear evidence of discriminatory practices, conscious or unconscious, and of disparate impact against African Americans." *Id.* The court rejected Armstrong's attempt to use such evidence, explaining as follows:

> Somewhat analogous evidence was discussed in *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1177 (7th Cir. 2002). In *Millbrook*, a failure-to-promote case that went to trial, the court of appeals discussed the plaintiff's attempt to establish pretext by pointing out that no African Americans were hired during a two-year time frame. 280 F.3d at 1177. The court stated that such evidence was "at best anecdotal," and it had held that it could not find discrimination on such a "thin basis." *Id.* (quoting *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996)). The court stated that its "opinions emphasize the need to get beyond a few comparison cases" and that "what a plaintiff . . . in [such a] position has to do is subject all of the employer's decisions to statistical analysis to find out whether race makes a difference." *Id.*

> Here, Armstrong has not presented a statistical analysis or proffered expert analysis of statistics. Rather, he simply identifies the percentage of African American [employees] working [for the Defendant] at a given time. Absent context, these percentages and numbers have little import. . . .The percentages of African American [employees], absent more, fails to create a reasonable inference that [the Defendant's] reasons for promoting other candidates are fabricated or pretextual. *See Id.*

*Id*. The court in *Armstrong* went on to explain that when presenting statistical evidence to support

allegations of discrimination (or to raise an issue about pretext), "the plaintiff must establish a causal connection between the employment practice and the statistical disparity, offering 'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotion because of their membership in a protected group.'" *Id.*, n.4 (quoting *Vitug v. Multistate Tax Com'n,* 88 F.3d 506, 513 (7th Cir. 1996)). Whipple's attempt to raise the specter of systemic discrimination at Taylor based on anecdotal evidence about the percentage of African-American professors and students fails for two reasons. First, since the court concludes that Whipple fails to establish a *prima facie* case of hostile environment race discrimination, the issue of pretext need not even be addressed. Second, Whipple does not present his "statistical" evidence in any proper context, which means it has little to no probative value. Since the court need not reach the pretext issue in this case, and since the anecdotal and statistical evidence submitted by either party is not probative and will not be considered by the court in assessing the pending summary judgment motion, Whipple's motion to strike Taylor's statistical evidence is moot.

As to item four above, Whipple objects to Taylor's inclusion of a specific paragraph contained in the Taylor Faculty Handbook, because, he says, that particular paragraph "address[es] faculty tenure, but only those hired [sic] before February 10, 1989. The Plaintiff was not hired by the Defendant until 2006. This portion of Defendant's document, therefore, is irrelevant." Plaintiff's First Motion to Strike, p. 3. Taylor readily concedes, however, that the "Faculty Tenure process/standard for faculty hired after February 1, 1989[,] applies to Plaintiff[,]" and that "Taylor included the entire . . . Faculty Handbook under the rule of completeness so as to not mislead the Court. Therefore, it is admissible." Defendant's Response to Plaintiff's First

Motion to Strike, p. 5. This matter is not an issue at all and it is unfortunate that the court must spend time addressing it. The paragraph Whipple seeks to strike is the first paragraph under Section 9 of the Taylor Faculty Handbook, which section is titled "Faculty Tenure." (DE 42-3, p. 23.) The next line under that heading reads: "(Applies to faculty hired before February 10, 1989)." *Id*. (parentheses in original, quotation marks added). That notation is followed by the paragraph that Whipple argues is irrelevant and should be stricken. Then, immediately following the challenged paragraph, there is a second notation that indicates that the remainder of the section "(Applies to faculty hired after February 10, 1989)." *Id*. In other words, the paragraph Whipple challenges is not even in the game here, as Taylor readily concedes. Whipple could just as easily have objected to the first paragraph of page 17 of the exhibit, which discusses Taylor's faculty orientation program, and which has no relevance at all to this case; or, he could have raised the same relevance objection to a paragraph on the next page that summarizes the requirements for class field trips. The point is, the vast majority of the Faculty Handbook has no relevance to this case. In any event, the court did not consider the challenged text and neither party disputes the tenure procedure that applied to Whipple, so this argument is also moot.[4]

As to items five and seven above, Whipple's argument that the court should strike any statements or comments made by Pastor Ballard or others to Bedi while Bedi was investigating allegations that Whipple had a physical confrontation with a student off campus is also moot. Yes, the statements are hearsay and, yes, Taylor *might* still be able to present it to a jury based on a hearsay exception argument. If determined to be admissible, these statements could serve as

---

[4] What the court means is that there is no dispute about the tenure provisions *in effect* at the time of Whipple's tenure review process. The parties do, however, argue about whether those provisions were properly *applied* during Whipple's review, an issue that is addressed below.

evidence supporting Taylor's proffered, nondiscriminatory explanation for denying tenure (i.e., it is evidence of Whipple's alleged "collegiality" problems). But once again, none of this evidence was relevant to the court's assessment of Taylor's motion for summary judgment, as will become clear when the court is finally able to get to that assessment. Whipple's motion to strike this evidence is moot.

Finally, there is item six on Whipple's list. Whipple objects to the inclusion of an undated, unsigned statement wherein the author claims that several other professors in the music department experienced difficulties working with Robertson. Whipple argues that "[t]here is no evidence the document is based upon the firsthand knowledge of the author, and therefore it is inadmissible hearsay[.]" Plaintiff's Reply in Support of First Motion to Strike, p. 4. The dirt road metaphor doesn't even apply here–this is more akin to a footpath. It turns out, as Taylor points out, that the document in question was apparently written by none other than Whipple himself. The document was presented as an exhibit during Whipple's deposition and, as Taylor explains, it "finds its foundation and basis in personal knowledge in . . . deposition testimony by Plaintiff . . . ." Defendant's Sur-Reply (DE 77), p. 1. Whipple testified that he wrote at least the portion of the document that appears as Defendant's exhibit (the rest of it was apparently redacted). Whipple Deposition (DE 42-5), pp. 136-137. In light of this, Whipple's objection to the document on the grounds that it is inadmissible hearsay and not based on the personal knowledge of the author is absurd and yet another example of the sloppy briefing and argument in this case. In any event, this document is not relevant to the court's ruling on the motion for summary judgment, and the debate about its admissibility is moot.

**B. Defendant's motion to strike (DE 61).**

The battle gets even messier with the Defendant's motion to strike. In that motion, Taylor seeks to exclude countless statements presented by Whipple (maybe even several dozen–the court lost count while reading the motion). Defendant's Motion to Strike (DE 61), generally. Taylor's motion is 21 pages long and seeks to strike statements included in Whipple's briefs, statements made during Whipple's deposition, affidavits submitted by Whipple in opposition to summary judgment, and even specific words or phrases contained within specific sentences in specific paragraphs in Whipple's pleadings. For example, in his Statement of Genuine Issues Whipple includes the following statement: "Whipple protested being denied tenure, which he identifies as being the result of Dr. Harrison's and Dr. Jones' use of their influence to retaliate against Whipple for his prior grievance against Robertson for racially motivated harassment[.]" Plaintiff's Statement of Genuine Issues (DE 56-1), p. 12. In its motion to strike, Taylor placed the words "he identifies" in boldface italics and then argued that "[t]he ***emphasized text*** above stands as ***inadmissible conclusory declarations*** by Whipple[]" and therefore is inadmissible. Defendant's Motion to Strike, pp. 16-17 (boldface and italics in original, apparently so as to drive home the point). Actually, it is unclear (not surprisingly) whether Taylor is seeking to strike just the words "he identifies," or if it is arguing that the entire paragraph should be stricken due to its conclusory nature. In another part of its motion to strike, Taylor quotes a passage, again from Whipple's Statement of Genuine Issues, and imbeds within that passage bracketed phrases pointing out why portions of the paragraph should be stricken because they are "inadmissible conclusory declaration[s]" or "inadmissible hearsay statement[s]" or "inadmissible hearsay evidence" or "unsupported conclusion[s]" or "inadmissible conclusory declaration[s]." *Id*., pp. 15-16. With

regard to that single paragraph from Whipple's Statement of Genuine Issues, Taylor raises nine objections.

It gets better. Taylor also seeks to strike "[a]ll references to Plaintiff's Complaint . . . because the same does not stand as admissible evidence. In opposing a motion for summary judgment, the non-moving party 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth facts showing that there is a genuine issue for trial.'" *Id.*, p. 18 (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 248). Taylor's theory here appears to be that since Whipple's Complaint contains some self-serving allegations and conclusory statements (are there Complaints that don't?), any reference to that Complaint in Whipple's briefs should be stricken and not considered by the court. This argument would have some legitimacy if Whipple was in fact relying solely "upon the mere allegations or denials of his pleading[s]" to oppose Taylor's motion for summary judgment. But he isn't–he presents evidence in support of his opposition (even if Taylor believes that all of that evidence should be stricken). Taylor's reasoning here is flawed. Taylor characterizes Whipple's Complaint as nothing more than a compilation of unfounded allegations and conclusory statements, quotes part of the holding from *Anderson*, and then argues that Whipple cannot survive the motion for summary judgment because he is relying solely on "mere allegations" to oppose it. When litigants take the "kitchen sink" approach to pleading, their briefs are bound to include red herrings, whether intentional or unintentional. The court will revisit Taylor's motion to strike shortly.

### C. Plaintiff's second motion to strike (DE 67).

Finally, there is Whipple's second motion to strike. In this motion the Plaintiff asks the court to strike "Defendant's Exhibit 1, 'Second Affidavit of Thomas Jones,' with attachments A-

L." This affidavit and its attachments were filed with Taylor's reply brief in support of its motion for summary judgment, and Whipple argues that they are thus untimely "because the Defendant failed to file them with the Defendant's by [sic] its dispositive motion deadline or with its motion for summary judgement [sic]." Plaintiff's Second Motion to Strike, p. 1. Taylor opposes this motion because, it argues, it "found itself compelled to file the 2nd [sic] Jones Aff. [sic] because Dr. Muchiri continues to be confused regarding her tenure review process." Defendant's Response to Plaintiff's Second Motion to Strike, p. 1. Dr. [Mary] Muchiri's affidavit, submitted by Whipple, is one of the items Taylor seeks to exclude by way of its own motion to strike (*see* DE 61, pp. 20-21). That notwithstanding, Taylor filed a second affidavit from Jones, along with attachments, not "to gain a tactical or procedural advantage . . ." but rather "to clarify the record" with regard to statements made by Dr. Muchiri in her affidavit. *Id.*, p. 2. Without going into unnecessary detail at this point, Whipple argues that his tenure review process was irregular in structure (in that he was subjected to four interviews with the Faculty Personnel Committee as opposed to the standard one interview). He presents the affidavit of Muchiri, another African-American professor at Taylor, who states that she was denied tenure twice, in 2006 and 2007, before being granted tenure after her third application in 2009. (DE 56-46.) Muchiri doesn't explain why she was denied tenure on her first two attempts, but she does state that "[t]he individuals who were in the group reviewing my tenure application each time were all Caucasian." *Id.*, ¶ 8. The implication, of course, is that African-American professors were treated less favorably than professors who were not members of that protected class. It was in response to Muchiri's affidavit that Taylor presented the second Jones affidavit, in which the dean claims that Muchiri was mistaken about the tenure process. Jones states that "Muchiri's confusion is that she

does not realize or understand that an application for tenure is not a formal application until it goes to the Faculty Personnel Committee[.]" and that Muchiri's first two applications never made it that far, meaning that she "did not formally apply for tenure with the FPC until January 2009." (DE 62-1, p. 1, ¶¶ 4, 6.) Other than noting that the people who reviewed her tenure application were all Caucasian, Muchiri does not expressly state that her tenure review process was tainted by racial animus. Still, Whipple presents her affidavit in an attempt to show that he and Muchiri were treated differently during the tenure review process. While conceding that "'[E]vidence of a defendant's behavior toward . . . other employees in the [same] protected group as the plaintiff's is relevant circumstantial evidence[,]'" Taylor argues that Muchiri's affidavit "is irrelevant and inadmissible 'me too' evidence. Although Muchiri takes issue with her tenure review and promotion processes, she fails to articulate any facts that her treatment was because of race or that she was racially harassed or retaliated against because of her race." Defendant's Motion to Strike, pp. 20-21 (quoting *Jones v. National Council of YMCA of U.S.*, 48 F.Supp.3d 1054, 1102-03 (N.D.Ill. 2004)). Once again, however, this issue is moot. Even if Muchiri's affidavit is considered as part of the mosaic of evidence Whipple is attempting to present to support his race claim, it does not change the court's conclusion regarding the merits of that claim, which is that Whipple's evidence falls woefully short of establishing a *prima facie* case of a racially hostile work environment claim. The second Jones affidavit doesn't change any of this. Even accepting the fact that Whipple and Muchiri, both African-Americans, were subjected to a tenure review process that differed from the norm (a disputed fact, at least as to Muchiri, but not a material one), this piece of Whipple's factual mosaic does not save his race claim, and so the motion to strike

Jones's second affidavit is moot.[5]

Taylor claims it submitted the second Jones affidavit in order to "to clarify the record"–an ironic assertion. It is too late for either party to "clarity the record" at this point–they have both muddied the waters with poorly constructed and, to an unfortunate degree, poorly reasoned motions to strike. Whipple seeks to exclude almost every bit of evidence Taylor presents that raises questions about his conduct (i.e., his collegiality) while employed at the University, and Taylor seeks to exclude seemingly every statement Whipple makes in any of his pleadings, including his Complaint, and the majority of other evidence (such as affidavits) that he filed in opposition to the motion for summary judgment. Mindful of the fact that both sides expended a great deal of effort to turn these evidentiary disputes into a needlessly over-complicated bucket of worms (although Taylor wins the gold star in that regard for its brief in support of its motion to strike), the court will endeavor to clear some of the trees so the forest once again becomes visible.

---

[5] Taylor readily concedes that Whipple's tenure review process was not typical in that he was required to participate in four meetings during the process rather than the usual single interview. Music Department Chair Harrison stated that "]i]n preparing for the review of Whipple's tenure application . . . I determined that it would be best to devote a series of four (4) meetings for the review[.]" Harrison Aff., (DE 42-6, p. 9, ¶ 20.) Taylor also insists that it imposed this multiple-meeting format so as to give both sides ample opportunity to discuss Whipple's concerns about race issues, which of course he had complained about, formally and informally, for several years. As Harrison stated it, the topic of Whipple's concerns about race was "added as a potential topic to be discussed in Whipple's tenure review *because Whipple explicitly presented this issue in his Annual Professional Growth Form.*" *Id*., ¶ 18 (emphasis in original, of course). Harrison also noted, however, that "at Whipple's request, I removed the item related to 'feelings of alleged racism' from my response to Whipple's Annual Report and the same was not considered during Whipple's tenure review process." *Id*., ¶ 19. It is not for the court to determine the veracity of these statements, which, in any event, go to the issue of pretext–an issue the court need not reach in this case.

There is really a single overriding theme presented in the motions to strike, to wit: neither side wants the court to consider what it characterizes as hearsay, or statements that are "conclusory," "self-serving," or "irrelevant." That is fair enough, on its face. The problem is that the parties use those terms so loosely and apply them so broadly that they end up essentially challenging every bit of evidence the other side has submitted. Fortunately, there is a simple way out of this quagmire. The parties' premise is correct in that "[a]dmissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (citing *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible evidence will not overcome a motion for summary judgment)). It is also true, however, that "[t]here is of course nothing wrong with relying on self-serving statements to defeat summary judgment[,]" as long as those statements are based on admissible evidence. *Thomas v. City of Michigan City*, 2015 WL 9239828, at *3 (N.D. Ind. Dec. 16, 2015) (citations omitted). The parties fail to acknowledge this distinction, which admittedly can be a fine one, and that failure renders many of their arguments toothless. Again, this is especially true of Taylor's motion to strike. Granted, there are many instances in the record, as in Whipple's Complaint and his pleadings in opposition to summary judgment, where he makes obvious conclusory, speculative, or self-serving statements (the one mentioned above, where "he identifies" retaliation as a motivating factor in his termination, is just one example). But Taylor's unnecessarily complicated and messy motion to strike doesn't accomplish what should be its goal–to assist the court in identifying those specific, *material* admissibility issues that must be resolved before the merits of the motion for summary judgment can be addressed. Instead, it paints with such a broad brush that it ends up challenging almost

every statement Whipple makes, as illustrated by Taylor's nine objections to a single paragraph of Whipple's opposing materials.

The kicker in all this is that the court has no intention of considering inadmissible evidence, be it hearsay or conclusory statements or those scary sounding "inadmissible conclusory declaration and hearsay statements" (Defendant's Motion to Strike, p. 15). The court will do its best to assess the merits of Taylor's motion for summary judgment according to the proper standard, which includes considering all relevant evidence submitted by both sides, drawing all reasonable inferences in favor of Whipple as the nonmovant, and determining whether Taylor is entitled to judgment in its favor or whether Whipple has presented sufficient evidence demonstrating that there are genuine material issues that can only be resolved by a jury.

All of this is not to say that the parties don't have some legitimate beefs tucked away in the morass of arguments they present in their motions to strike (as opposed "kitchen sink" issues that are inconsequential or irrelevant–and there are a lot of those). But addressing every one of the evidentiary "issues" presented on an item by item or line by line basis, which the motions to strike (especially Taylor's) invite the court to do, would be extremely inefficient and, more importantly, distract from the ultimate task at hand–determining whether Whipple has presented sufficient admissible evidence to survive summary judgment. It is sufficient to hold that Taylor's motion to strike is granted in part, to the extent that it raises valid and relevant evidentiary issues, and denied in part, to the extent that many (probably most) of the issues are irrelevant or immaterial.

**II. Motion for Summary Judgment.**

**A. Timeliness of the Plaintiff's Claims.**

Taylor argues that "[m]any of the actions about which Whipple now complains are

untimely[.]" Defendant's Memorandum, p. 3. (What Taylor means, of course, is that Whipple's complaints were untimely.) Taylor correctly states that an individual alleging discrimination under Title VII "must file a Charge [of Discrimination] with the EEOC within 180 days of the complained-of employment action . . . ." *Id*. (citing 42 U.S.C. § 2000e-5(e)). Taylor also concedes that Indiana is a "deferral" state, meaning that if an individual files his charge of discrimination with a state or local agency (such as the Indiana Civil Rights Commission, for example), "'the time limit for filing with the EEOC is extended to 300 days.'" *Id*. (quoting *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 110 (1988)). Since it is undisputed that Whipple did not file his first charge of discrimination with a state or local agency before he filed it with the EEOC, Taylor contends that the 180-day limitations period applies in this case. Accordingly, "Whipple's claims in this lawsuit are limited to alleged incidents which occurred after April 10, 2011, as Charge 1 was file-stamped by the EEOC on October 7, 2011." *Id*.[6] Taylor argues that "[p]ursuant to the 180-day statute of limitations, the following incidents about which Whipple complains are time-barred under Title VII: (1) the 2006/2007 recommendation from the University that he pursue singing lessons; (2) the 2006 alleged comment by Robertson that Taylor hired Whipple because of his race; and, (3) all other incidents prior to April 10, 2011." *Id*., pp. 3-4.

Whipple claims that Taylor "is wrong in its claim that it cannot be held liable under Title VII for discriminatory actions that occurred more than 180 days prior to the filing [of] either of Dr. Whipple's Charges, because they ignore current Indiana law." Plaintiff's Response, pp. 2-3.

---

[6] Whipple's second charge, filed on November 9, 2012, expressly states that it was filed with the EEOC *and* the ICRC. *See* Plaintiff's Exhibit C (DE 56-4), p. 3. It is only his first charge that is at issue here and, as stated, it is undisputed that the first charge was filed only with the EEOC.

Whipple maintains that under Indiana law, a complainant can file a charge of discrimination with either the EEOC or a state or local agency, and that the 300-day limitations period applies in either instance. *Id*. (citing *Allen v. International Truck and Engine Corp*., 2013 WL 1332071, *1 (S.D.Ind. March 29, 2013)).[7] Whipple states that because the State of Indiana has "a work sharing agreement" with the EEOC, aggrieved individuals can file complaints with either the EEOC or a state agency and the 300-day limitation period applies to those complaints. *Id*. (citing *Koch v. CGM Group, Inc.*, 2001 WL 392523 (S.D.Ind. Apr. 3, 2001)). Therefore, claims Whipple, his complaints about "unlawful discriminatory and retaliatory actions taking place as far back as December 10, 2010[,] are actionable." *Id*., p. 4.

Whipple goes even farther, contending that "[t]he temporal scope of actionable events covered by Dr. Whipple's Complaint extends back even past December 10, 2010, to cover unlawful discrimination that occurred as far back as 2006, under the continuing violation doctrine." *Id*. (citing *Lee v. Aaron's Sales & Leasing*, 2009 WL 3111357 *6 (N.D. Ind. Sept. 24, 2009)) ("in some circumstances, the continuing violation theory may apply to allow plaintiffs to recover for discriminatory acts that would otherwise be barred by the applicable statute of limitations."). Whipple points out that "as noted on both of his Charges, the discrimination and unlawful retaliation was part of an ongoing continuing action." *Id*., p. 5. In addition to checking the box on both of his Charge forms indicating that he was complaining of "continuing action"

---

[7] The Plaintiff's brief cites to "*Allen v. International Truck & Engine Corp.*, Cause No. 1:02-cv-902-RLY-TAB, *2-3 (S.D. Ind. 3-29-2013)." Plaintiff's Response, p. 3. The Plaintiff apparently intended to cite to 2013 WL 1332071 (S.D.Ind. March 29, 2013) (which carries the district court's internal cause number of 1:02-CV-902), and the portion of the holding he references appears on page one of that case, not pages 2-3. The Plaintiff's briefs are replete with improper citation form and the court has endeavored to use the correct form in this order.

violations, his "2011 Charge also stated '[Complaining Party] alleges a pattern of continuing

conduct related to race discrimination,' and 'the problems began in October 2006.'" *Id*., p. 6;

*see* Charge of Discrimination, Oct. 7, 2011, (DE 56-4) Plaintiff's Exhibit C, pp. 1-2, and Charge

of Discrimination, Nov. 9, 2012, *Id*., p. 3. Whipple argues, then, that "[t]hese facts, added to the

nature of Dr. Whipple's allegations pertaining to his hostile working environment claim,

demonstrate that he has asserted a continuing violation by the Defendant, which extends the

Defendant's liability for any racially harassing and discriminatory actions back in time by more

than five (5) years prior to the filing of his first Charge of Discrimination." *Id*.

     In its reply brief, Taylor cites *Helm v. Ancilla Domini College*, 2012 WL 33018 (N.D. Ind.

Jan. 5, 2012), and argues that it is Whipple who is misinterpreting the law. Defendant's Reply, pp.

3-4. In *Helm*, this court (Judge DeGuilio), addressing the issue of a 180-day limitation period

versus a 300-day period, stated as follows:

> Our circuit's case law on the Title VII filing deadline is in conflict. *See, e.g.,*
> *Chaudhry v. Nucor Steel–Indiana,* 546 F.3d 832, 836 (7th Cir. 2008) ("[An
> EEOC] charge must be filed within 300 days after the alleged unlawful
> employment practice occurred or else the employee may not challenge the practice
> in court"); *but see Williamson v. Indiana University,* 345 F.3d 459, 463 (7th Cir.
> 2003) ("A claimant may file a charge of discrimination with the EEOC within a
> 180-day window permitted under Title VII"). The statute itself reads:
>
>> A charge under this section shall be filed within one hundred and eighty
>> days after the alleged unlawful employment practice occurred and notice of
>> the charge (including the date, place and circumstances of the alleged
>> unlawful employment practice) shall be served upon the person against
>> whom such charge is made within ten days thereafter, except that in a case
>> of an unlawful employment practice with respect to which the person
>> aggrieved has initially instituted proceedings with a State or local agency
>> with authority to grant or seek relief from such practice or to institute
>> criminal proceedings with respect thereto upon receiving notice thereof,
>> such charge shall be filed by or on behalf of the person aggrieved within
>> three hundred days after the alleged unlawful employment practice

> occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.
>
> 42 U.S.C. § 2000e–5(e)(1). A plain reading indicates that more is required to trigger the extended 300–day limitations period than the bare fact that this suit arose in a "deferral state." Under the terms of the statute, it seems that a plaintiff must actually file with the Indiana Civil Rights Commission ("ICRC") in order to extend her EEOC filing deadline.

*Helm v. Ancilla Domini College*, 2012 WL 33018, at *10, n. 7 (N.D. Ind. Jan. 5, 2012). It is an unsettled question in this circuit whether a complainant must file with a state or local agency first (or simultaneously with the EEOC) to trigger the 300-day period. Again, Whipple cites several cases that he claims hold the opposite–that the 300-day period applies even if a complainant does not initiate his charge with a state agency. Plaintiff's Response, pp. 3-4. These include the aforementioned *Allen*, 2013 WL 1332071, *1 (complainant exhausts administrative remedies "by filing a charge of discrimination with the . . . EEOC, *or* comparable cooperating state agency, within 300 days of the alleged discriminatory conduct.") (italics added); and *Koch*, 2001 WL 392523, *4 (employee did not file charge with both EEOC and state agency, but 300-day limitation period applied). The cases cited by Whipple imply that the 300-day period applies in Indiana regardless of whether a claim is initiated with a state agency or the EEOC, although only the *Koch* case arguably makes that express holding. On the other hand, Judge DeGuilio's discussion of this issue–which he includes in a footnote–is dicta, since he concluded that the issue was not a dispositive one in that case. Neither party provides, nor was the court able to find, any conclusive precedent on this issue.[8] This court, however, need not resolve this issue in this

---

[8] This issue of the applicable filing period was discussed at length in the case of *Gul-E-Rana Mirza v. The Neiman Marcus Group, Inc.*, 649 F.Supp.2d 837, 849-52 (N.D. Ill. 2009).

case, since Whipple's "continuing violation" argument carries the day anyway.

The Seventh Circuit recently addressed the applicability of the continuing violation

doctrine, writing as follows:

> The limitations period for a Title VII claim runs from the date the unlawful
> employment practice occurred, and the Supreme Court has held that for claims
> based on "discrete acts" of retaliation or discrimination, the "discrete retaliatory or
> discriminatory act 'occurred' on the day that it 'happened.'" *Nat'l R.R. Passenger
> Corp. v. Morgan*, 536 U.S. 101, 110, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).
> This rule applies even if an old, unchallenged discriminatory act has a present
> effect on an employee's status in a seniority system, a progressive discipline
> system, or some other dynamic employment scheme. "A discriminatory act which
> is not made the basis for a timely charge . . . is merely an unfortunate event in
> history which has no present *legal* consequences." *United Air Lines, Inc. v. Evans*,
> 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (emphasis added). So
> the "discrete act" that starts the Title VII limitations clock is the discriminatory
> decision itself, *not* the "*consequences* of the act[ ]" that may materialize down the
> road. *Del. State Coll. v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431
> (1980) (citation omitted).
>
> There is an exception to this general rule. Under the "continuing violation"
> doctrine, a Title VII plaintiff may recover for otherwise time-barred conduct that
> is part of a single, ongoing unlawful employment practice if at least one related
> act occurs during the limitations period. *See Morgan,* 536 U.S. at 116–18, 122
> S.Ct. 2061. As the Supreme Court clarified in *Morgan,* however, this doctrine is
> limited to claims of hostile work environment. "Hostile environment claims are
> different in kind from discrete acts. Their very nature involves repeated conduct."
> *Id.* at 115, 122 S.Ct. 2061. "[T]he theory is that '[a] hostile work environment
> claim is composed of a series of separate acts that collectively constitute one
> 'unlawful employment practice.'" *Swanson v. Village of Flossmoor*, 794 F.3d
> 820, 826 (7th Cir. 2015) (quoting *Morgan*, 536 U.S. at 117, 122 S.Ct. 2061). As
> such, a Title VII claim for hostile work environment is timely "as long as 'any act
> falls within the statutory time period,' even if the [claim] encompasses events
> occurring prior to the statutory time period." *Adams v. City of Indianapolis*, 742
> F.3d 720, 730 (7th Cir. 2014) (quoting *Morgan*, 536 U.S. at 120, 122 S.Ct. 2061).

*Barrett v. Illinois Dept. of Corrections*, 803 F.3d 893, 898-99 (7th Cir. 2015). As another district

---

While the court discussed the issue in the context of its application in Illinois, the discussion
presented in that case illustrates the continuing uncertainty and confusion that exists on this
point.

court recently explained:

> Claims of hostile work environment are different in kind from discrimination because they involve repeated conduct that does not fully manifest itself on any particular day. Therefore, a hostile work environment claim is timely so long as one of the acts contributing to the hostile work environment occurred within the 300-day filing period. *Morgan*, 536 U.S. at 116–117. The continuing violations doctrine, therefore, links a time-barred act with an act that occurred within the 300-day limitations period by treating the separate claims as one continuous act. *See Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992).

*Harris v. Board of Education of City of Chicago*, 2015 WL 5693523, at *9 (N.D.Ill. Sept. 28, 2015). Under the doctrine, "a plaintiff can 'delay suing until a series of wrongful acts blossoms into an injury on which suit can be brought.'" *Slaughter v. Winston & Strawn LLP*, 2015 WL 7077331, at *2 (N.D.Ill. Nov. 13, 2015) (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014)). A "continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Dasgupta v. Univ. of Wisconsin Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997).

In his Complaint, Whipple makes clear that he "alleges a continuing pattern of severe and pervasive harassment on the basis of his race that created a hostile work environment and affected the terms and conditions of his continued employment at [Taylor]." Complaint, ¶ 11. He asserts that this racially based harassment manifested itself in myriad ways throughout his employment with Taylor. *Id*., generally. By way of example, Whipple makes the following contentions:

1) In April 2006 while he was visiting the Taylor campus, two other faculty members allegedly made remarks to Whipple that the environment at the University was not one in which

an African-American professor would feel comfortable. (*Id.*, ¶ 12);

2) Beginning in his first semester of employment, Whipple felt "underutilized" and "had very little input into what he was doing." He met with Robertson to discuss his concerns and during one such meeting he claims she told him that the only reason he was hired was "because you are black." (*Id.*, ¶ 13);

3) During the 2010-11 academic year, Whipple became eligible for promotion from assistant professor to associate professor, and applied for this promotion on October 15, 2010. He claims that "[i]n the Fall of 2010, Dr. Robertson began to talk to [him] about other jobs. On the day before Dr. Whipple's promotion hearing, Dr. Robertson entered Dr. Whipple's classroom between classes and wrote 'Samford University' on the board and suggested to Dr. Whipple that he apply there." (*Id.*, ¶ 15);

4) On November 5, 2010, Whipple filed a complaint with the University in which he complained about what he perceived as "race harassment by Dr. Robertson." University Provost Bedi instructed Whipple and Robertson to meet with "a specialist in racial conciliation." (*Id.*, ¶ 17);

5) "On February 21, 2011, Dr. Whipple's application for promotion was denied citing issues of collegiality related to Dr. Whipple's complaints regarding race based issues with Dr. Robertson and others." (*Id.*, ¶ 17);

6) Whipple successfully appealed the denial of his promotion but alleges that "he experienced retaliation and continued race related issues throughout the year." These issues, according to Whipple, included an increased workload "without a corresponding increase in compensation and . . . lower levels of administrative support." (*Id.*, ¶ 18);

7) Whipple became eligible for tenure in 2012. During Whipple's tenure application process, Harrison noted that there were "several issues that would need to be addressed in the tenure review process[.]" and that "[a]mong the items to be addressed were Dr. Whipple's 'feelings about Taylor related to racism[.]'" (*Id*., ¶ 21);

8) Whipple's application for tenure was denied on July 30, 2012, and "[i]n conjunction with denial of tenure, the University did not renew Dr. Whipple's contract thereby ending his employment at the conclusion of the 2012-2013 academic year." (*Id*., ¶¶ 22-23).

Whipple filed his first charge of discrimination on Oct. 7, 2011. (DE 56-4, pp. 1-2.) In that charge, Whipple made the following pertinent statements and allegations:

1) He indicates that he is filing the charge based on race discrimination and retaliation. (*Id*., p. 1);

2) He claims the alleged discriminatory conduct took place between "8/2006 to present." *Id*.);

3) He "alleges a pattern of continuing conduct related to race discrimination." (*Id*.);

4) He states that "[t]he problems began in October 2006[.]" (*Id*.);

5) He recounts incidents of alleged harassment and retaliation (most all of which are set forth above) that he says occurred between 2006 and 2011. (*Id*.)

Whipple filed his second charge of discrimination on Nov. 9, 2012. (DE 56-4; Plaintiff's Exhibit C, p. 3.)  In that charge, Whipple made the following pertinent statements and allegations:

1) He indicates that he is filing the charge based on race discrimination and retaliation. (*Id*.);

2) He states that the alleged discriminatory conduct described in the charge took place between "10-03-2011 and 10-16-2012." (*Id*.)

3) He charges that the discriminatory acts of which he complains are a "continuing action." (*Id*.);

4) He recounts incidents of alleged racially based harassment and retaliation (including the denial of his tenure application and the termination of his contract). (*Id*.)

Based on all of the above, Whipple contends that he has pleaded a hostile environment claim, is entitled to invoke the continuing violation doctrine due to the recurring nature of the discrimination he alleges he suffered, and the debate about a 180-day limitation period versus a 300-day period is therefore much ado about nothing. The court agrees. The allegations included in Whipple's charges of discrimination and in his Complaint make it clear that he has pled a hostile environment claim against Taylor and invoked the continuing violation doctrine.

Taylor, however, argues that the doctrine is not applicable in this case. Defendant's Reply, p. 4. Taylor devotes only one page of its reply brief to this issue. The University claims that a plaintiff invoking the doctrine must show that: 1) he is complaining about a pattern of conduct; and 2) that he "'was reasonable not to perceive working conditions as intolerable until the acts of harassment had, through repetition or [accumulation], reached the requisite level of severity.'" *Id*., p. 5 (quoting *Russell v. Bd. of Trustees of the Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001)). Taylor then argues that "Whipple asserts that Taylor subjected him to discrimination, retaliation and harassment since 2006 and that he constantly complained to Dr. Harrison, starting in 2008. . . . According to Whipple's own summary of the facts, there exists no reason for Whipple's delayed filing of the charges. Therefore, any claims pre-April 10, 2011,

stand time-barred." *Id.*, p. 5. It is true that a plaintiff cannot invoke the continuing violation doctrine in order to excuse the tardy filing of charges of discrimination. See, e.g., *Evans v. Gloucester Township*, —F.Supp.3d– , 2015 WL 5012593, at *7 (D.N.J. Aug. 1, 2015) ("the doctrine does not permit . . . the aggregation of discrete discriminatory acts for the purpose of reviving an untimely act of discrimination that the victim knew or should have known was actionable."). Taylor says that Whipple obviously believed that illegal discrimination was afoot as early as 2008, when he began complaining to Dr. Harrison about alleged racial harassment, but he failed to file his first charge until October 2011. Accordingly, argues Taylor, he cannot invoke the continuing violation doctrine in order to base claims on, or even present evidence about, any act that took place before April 10, 2011.

The resolution of this issue turns on the reasonableness of Whipple's delay in filing his first charge of discrimination. Put another way, were the acts of alleged harassment to which Whipple claims he was subjected sufficiently severe or intolerable that he should have filed a charge of discrimination before October 2011 (Taylor says yes, and therefore the continuing violation doctrine does not apply) or was he justified in filing when he did (since, after all, a plaintiff is within his rights to "'delay suing until a series of wrongful acts blossoms into an injury on which suit can be brought.'" *Slaughter*, 2015 WL 7077331, at *2)? If a plaintiff's delay in filing a charge is reasonable, based on the ongoing nature of the events giving rise to it, then a Title VII claim for hostile work environment is timely "as long as 'any act falls within the statutory time period,' even if the [claim] encompasses events occurring prior to the statutory time period." *Adams v. City of Indianapolis*, 742 F.3d at 730 (quoting *Morgan*, 536 U.S. at 120).

The court concludes that Whipple has demonstrated that his decision to file his first charge with the EEOC in October 2011 was reasonable under the facts of this case and, consequently, that the continuing violation doctrine applies. From the time he filed his first EEOC charge Whipple maintained that he was subjected to continuing incidents of discriminatory treatment and that "[t]he problems began in October 2006[.]" (First Charge of Discrimination, DE 56-4, p. 1.) In that first charge, he recounts his problems with Robertson beginning in the 2006-2007 academic year; Provost Stephen Bedi's December 15, 2010, written directive that Whipple and Robertson engage in a "racial reconciliation" session; the denial of his promotion in February 2011 and his successful appeal of that denial; and, an alleged incident on April 13, 2011, during which he claims Robertson "verbally attacked" him while they were attending the reconciliation session–an incident he claims went unaddressed by the administration after he reported it. *Id.*, pp. 1-2. Obviously, several of these "acts" occurred within 300 days, and even 180 days from the date of Whipple's first charge, even though the charge "encompasses events occurring prior" to either limitation period. For these reasons, the court rejects Taylor's argument that Whipple's claims, in part, are time-barred and summary judgment on that issue is denied.

### B. Plaintiff's *Prima Facie* Case of Race Discrimination.

Whipple's victory on the issue of the continuing violation doctrine is pyrrhic, since the court concludes that he fails to adduce sufficient admissible evidence to establish a *prima facie* case of race discrimination, even if all of his factual assertions are considered.

A plaintiff alleging employment discrimination can establish a *prima facie* case by utilizing either the direct or indirect method of proof. *Bisluk v. Hamer*, 800 F.3d 928, 934 (7th

Cir. 2015). Under the direct method, a plaintiff must show that his employer made an adverse employment decision "on an impermissible discriminatory basis." *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). Under the indirect method of proof, a plaintiff meets his initial burden by showing that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he was subject to an adverse employment action; and (4) similarly situated employees who were not members of the protected class were treated more favorably. *Id.* (citing *Ptasznik v. St. Joseph Hosp.,* 464 F.3d 691, 696 (7th Cir. 2006)). If a plaintiff establishes a *prima facie* case of discrimination, the employer must "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.*

However, as the Seventh Circuit has explained, the terms "direct" and "indirect" are "somewhat misleading," and "[t]he distinction between the two avenues of proof is 'vague.'" *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006) (quoting *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 902–03 (7th Cir. 2006)). In *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008), the court, discussing the two methods of proof, wrote as follows:

> The nomenclature is misleading because the phrase "direct method" tends to imply that an employee only may proceed under the direct method with "direct evidence." *See Sylvester*, 453 F.3d at 902-03. We recently have explained, however, that this is not the case. "[D]irect" proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (e.g., "You're too old to work here."), but also *includes circumstantial evidence* which suggests discrimination through a longer chain of inferences. *Luks*, 467 F.3d at 1053 (emphasis supplied).

> The focus of the direct method of proof thus is not whether the evidence offered is "direct" or "circumstantial" but rather whether the evidence "points directly" to a

discriminatory reason for the employer's action. *Burks v. Wisconsin Dep't of Transp.,* 464 F.3d 744, 751 n. 3 (7th Cir. 2006) (noting that the "'direct method' . . . requires the plaintiff to put forth evidence that demonstrates that she was a member of a protected class and '*as a result* suffered the adverse employment action of which [s]he complains'" (quoting *Sylvester*, 453 F.3d at 902)).

Whether a plaintiff utilizes the direct method or the indirect method of proof, "[t]he ultimate question under both methods . . . is 'whether a reasonable jury could find prohibited discrimination.'" *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015) (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86,* 746 F.3d 835, 840 (7th Cir. 2014)).

In this case, Taylor contends that Whipple cannot establish a *prima facie* case of race discrimination under either the direct or indirect method of proof. Defendant's Memorandum, pp. 6-9. According to Taylor, Whipple fails to establish that he suffered an adverse employment action (*Id*., p. 4-6); fails to establish that he was meeting Taylor's legitimate performance expectations (*Id*., pp. 10-12); fails to establish that Taylor treated non-African-American employees more favorably (*Id*., p. 12); and fails to refute Taylor's proffered, nondiscriminatory reason for denying him tenure and terminating his contract (*Id*., pp. 13-14).

Whipple's allegations and the evidence he presents to support them do not suffice to establish a *prima facie* case of race discrimination based on a hostile work environment theory. When inadmissible evidence, such as conclusory statements and hearsay, are removed from Whipple's pleadings, he is left with the following evidence to support his hostile environment claim:

1) the alleged statement by Robertson that Whipple was hired only because of his race and Whipple's allegation that he experienced frequent "professional disagreements" with

Robertson during his time at Taylor;

2) the fact that his promotion application was initially denied;[9]

3) the fact that he was never disciplined or sanctioned for his alleged collegiality problems, which Taylor claims were the basis for its decision to deny tenure;

4) his allegation that similarly situated, non-African-American professors were treated more favorably during the tenure review process; and,

5) the denial of his tenure application and the termination of his contract.[10]

---

[9] It is not entirely clear whether Whipple is including the initial denial of his promotion application as a fact that supports his race claim or only his retaliation claim. In his Complaint, he expressly states that the denial of promotion (even though it was later reversed) is evidence that he was retaliated against. Complaint, p. 6, ¶ 29. Taylor contends that because the promotion decision was reversed, the entire matter is irrelevant to *either* a race claim or a retaliation claim since it does not constitute an adverse employment action. Defendant's Brief, p. 6. Taylor argues that "initially being denied but ultimately being granted a promotion without any loss of pay, benefits or prestige at Taylor fail[s] to constitute [an] actionable adverse employment action[]." *Id*. The court will address this issue below in the context of Whipple's retaliation claim. However, even if the initial denial of Whipple's promotion application is considered an adverse action, it does not tip the scales in his favor with regard to his hostile environment race claim.

[10] Whipple included additional allegations in his EEOC charges and his Complaint, but at least some of those have fallen by the wayside. For example, Whipple contended that shortly after be began working at Taylor, he was told he needed to take voice lessons, a request he apparently felt was somehow racially motivated. First Charge of Discrimination, p. 1. However, in his response brief, Whipple "concedes there is no case law stating that being asked to obtain voice lessons by an employer is an actionable adverse job action actionable in a race discrimination/retaliation claim under Title VII." Plaintiff's Response, p. 6, n. 3. He also states that he "will not proceed forward on claims that being told to obtain singing lessons was in itself racial discrimination." *Id*. He also states that "[Dr.] Harrison's plan to add extra work to the professor's workload the last year Whipple was at the University, was changed. . . . It consequently was not an instance of actionable retaliation under Title VII." *Id*., p. 15, n. 4. (This is distinct from Whipple's allegation that Dr. Jones wrongfully imposed "extra job duties" on him in 2010, a fact that Whipple still contends supports his retaliation claim. This allegation is also addressed below in the context of that claim.)

Whipple argues that based on this evidence, a reasonable jury could find that he was subjected to a racially hostile work environment. The court disagrees for several reasons.

The Seventh Circuit has held that to avoid summary judgment on a hostile work environment claim, "'a plaintiff must provide sufficient evidence to create a genuine issue of material fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) [his] race or protected activity must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability.'" *Hopkins v. Bd. of Educ. of City of Chicago*, 73 F.Supp.3d 974, 984 (N.D.Ill., 2014) (quoting *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014)). Whipple's contentions and the admissible evidence he presents to support them are insufficient to establish a *prima facie* case. Even assuming that the problems Whipple experienced while at Taylor (i.e., Robertson's alleged expressions of racial bias, Dean Jones' imposition of increased duties, and an allegedly unfair tenure review process) rise to the level of "harassment," they wholly fail in establishing "that the harassment was severe or pervasive so as to alter the conditions of his work environment by creating a hostile or abusive situation." This is true even when all reasonable inferences are drawn in favor of Whipple. In determining whether alleged harassment was hostile, courts consider "the totality of the circumstances including such factors as the severity of the alleged harassing conduct, its frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the plaintiff's performance." *Porter v. City of Chicago,* 700 F.3d 944, 955-56 (7th Cir. 2012); *see also*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Whipple's claim gets a failing grade on this test.

Taylor argues that "rather than presenting a compelling mosaic of the evidence, [Whipple] attempts the prototypical 'spaghetti against the wall' litigation tactic, serving up a bevy of inadmissible self-serving statements and conclusions with the hope that one or two strands stick long enough to survive summary judgment." Defendant's Reply, p. 1. Putting aside the irony of this statement in light of the court's assessment of Taylor's motion to strike, the conclusion is correct. Whipple's evidence in support of his race claim consists of a recitation of events largely innocuous on their face, but which he concludes were really a continuous thread of racially offensive acts by Taylor.

As Taylor correctly points out, "'not everything that makes an employee unhappy is an actionable adverse action.'" Defendant's Memorandum, pp. 5-6 (quoting *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007)). Title VII is not a code of civility; instead, it only makes harassment actionable when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Cole v. Board of Trustees of Northern Ill. Univ.*, 38 F.Supp.3d 925, 932 (N.D.Ill. 2014) (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045–46 (7th Cir. 2002)). Also, as the Seventh Circuit has explained, "[a] materially adverse employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. . . . Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-

shoulder employee did not like would form the basis of a discrimination suit." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (internal quotation marks and citations omitted). To prove a hostile environment claim, a plaintiff must show that the alleged harassment was "sufficiently connected to race so as to satisfy the second element of the hostile environment analysis" and . . . the "conduct at issue must have a racial character or purpose to support a hostile work environment claim." *Anderson v. Office of Chief Judge of Cook County, Ill.*, 66 F.Supp.3d 1054, 1066 (N.D.Ill. 2014) (quoting *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713–14 (7th Cir. 2004)). In order to reach the level of severe or persuasive, so as to support a hostile environment claim, the harassment about which a plaintiff complains must be so extreme that a reasonable person would find that it rendered the workplace intolerable for the plaintiff. *See, e.g.*, *Harris v. FedEx Freight, Inc.*, 110 F.Supp.3d 805 (N.D.Ill. 2015) (supervisor asked African-American plaintiff "how many 'baby mamas'" he had; said he hoped the company "brought enough chicken and watermelon" to company picnic for plaintiff and his family); *Fulmore v. M & M Transport Services, Inc.*, 2012 WL 5331229, at *7-9 (S.D.Ind. Oct. 29, 2012) (court denied summary judgment because the supervisors had made at least three racial epithets, calling the employee the n-word and a "black motherfucker" and remarking that "it was a cold day in hell on President Obama's inauguration day."); *but cf., Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) ("occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers" generally does not create a work environment that a reasonable person would find intolerable and was insufficient to maintain hostile work environment sex harassment claim).

In the present case, Whipple bases his hostile work environment claim on a few incidents that, when examined objectively, do not rise anywhere near the level necessary to sustain such a

claim. He alleges that Robertson told him he was hired only because of his race;[11] he claims that Robertson verbally berated him during their counseling session and that he had many "professional disagreements" with her while he was at Taylor (although he does not allege that these disagreements included even a single reference to race, let alone the use of racial epithets); he alleges that he was subjected to an unfair tenure review process that improperly considered his complaints about the racial atmosphere at Taylor (although the University refutes this–see footnote five above); and he claims that the decision to deny his tenure application and terminate his contract was racially motivated (a conclusion on his part, since he presents no direct evidence, and insufficient circumstantial evidence, to support this contention). The court has no reason to doubt that Whipple subjectively perceived these events as a string of offensive acts, especially since "[a]ll Plaintiff has to establish is that he perceived the environment to be hostile or abusive." *Harris v. FedEx Freight*, 110 F.Supp.3d at 816. But in a hostile work environment claim "[t]he workplace that is actionable is the one that is 'hellish.'" *Logan v. Kautex Textron North America*, 259 F.3d 635, 641 (7th Cir. 2001) (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)). When considered objectively, in accordance with the legal standard, Whipple's allegations are insufficient to support an inference that he was subjected to a racially hostile work environment. He has failed to adduce sufficient admissible evidence to show that he was subjected to "severe and pervasive" racial harassment, thereby failing to establish his *prima facie* case, and Taylor is entitled to summary judgment on that claim for this

---

[11] Even if the court were to consider Whipple's allegations that Robertson told students not to take his classes (evidence that is clearly hearsay, as Taylor maintains), it doesn't change the calculus. "'Through the grapevine' or 'second-hand' conduct, is not sufficiently severe or pervasive to create a hostile work environment." *Wheeler v. Brady Corp.*, 712 F.Supp.2d 801, 821 (E.D.Wis. 2010) (citing *Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1046 n. 9 (7th Cir. 2000)).

reason.

**C. Plaintiff's *Prima Facie* Case of Retaliation.**

Taylor seeks summary judgment on Whipple's retaliation claim, arguing again that "[s]imilar to Whipple's race discrimination claim, Whipple cannot successfully prove a *prima facie* case of retaliation under Title VII." Defendant's Memorandum, p. 15. First, Taylor argues that the only adverse employment action that can form the basis for Whipple's retaliation claim is the denial of his tenure application and consequent termination of his contract. *Id*. As Taylor correctly notes, Whipple "asserts that Taylor took the following actions in retaliation for his harassment complaint against Robertson or the filing of Charge 1: (1) denial of tenure; (2) Julie Barber . . . replacing Robertson in her role with Taylor's opera program; (3) Dean Thomas Jones' . . . adding of job duties; and, (4) Harrison's attempts to add job duties." *Id*. Whipple admits that the last contention is not actionable. He concedes that "[Dr.] Harrison's plan to add extra work to the professor's workload the last year Whipple was at the University, was changed. . . . It consequently was not an instance of actionable retaliation under Title VII." Plaintiff's Response, p. 15, n. 4.

Taylor does not list the initial denial of Whipple's promotion as one of the facts supporting his retaliation claim. That is because, as the court noted above, Taylor insists that the denial does not meet the legal definition of an "adverse employment action." Defendant's Memorandum, p. 5. Taylor concedes that the denial of a promotion can be actionable, but only if it "resulted in a material harm that alters the 'terms, conditions, or privileges of [the plaintiff's] employment.'" *Id*. (quoting 42 U.S.C. § 2000e-2(a)(1)). Since the initial promotion denial was overturned, and since it is undisputed that Whipple did not suffer any loss of pay or benefits,

Taylor insists that Whipple cannot rely on this event to support his retaliation claim. For this part, Whipple merely includes the fact of the initial denial in his discussion of his retaliation claim. Plaintiff's Response, pp. 14 and 17. He does not, however, offer any authority at all to support his apparent contention that the denial of promotion constituted an adverse employment action even though it had no effect on the terms of his employment, his salary, or his benefits. Whipple appears to be arguing (or so the court infers, since he doesn't explain otherwise) that the mere fact that the denial occurred is sufficient to confer the title of "adverse employment action" upon it. The court is dubious of this argument, but like so many other issues in this case, this one is not relevant to the court's analysis or conclusion. Whipple's retaliation claim survives the motion for summary judgment whether the promotion denial is considered part of his evidentiary mosaic or not.

Turning to Whipple's contentions that Taylor retaliated against him by replacing Robertson with the allegedly less experienced Barber in the opera program and when Jones allegedly added to Whipple's job duties, these allegations, even when all reasonable inferences are drawn in favor of Whipple, do not constitute adverse employment actions and therefore cannot be the basis for a retaliation claim (or race claim, for that matter). Whipple claims that "[i]n response to the November 2010 grievance [against Robertson], the decision was made to remove Robertson from her role in the Opera program, and replace her with a[] less qualified and less experienced assistant . . . that was not available or present to assist for at least or a [sic] three to four weeks' [sic] worth of classes during a semester in which Whipple needed someone to assist in covering the duties left uncovered by Dr. Robertson's [exit] from the opera production." Plaintiff's Response, p. 15. Whipple argues that based on this, "a reasonable trier of fact could

conclude that the Defendant's replacement of Robertson by Barber increased Whipple's work load enough for it to have created a materially adverse job action." *Id*. The court disagrees. While the fact that Robertson was replaced in the opera program by an allegedly less experienced and less qualified professor may indeed have increased Whipple's workload or created some degree of hardship in the performance of his duties with regard to the program, such an action clearly does not rise to the level of an adverse job action. As stated above, "[a] materially adverse employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Crady v. Liberty Nat'l Bank & Trust*, 993 F.2d at136.

Similarly, Whipple contends that "[t]he extra job duties imposed upon Dr. Whipple by the dean[,] Dr. Jones, was [sic] also sufficient of burden [sic] to be actionable action [sic] under a Title VII retaliation claim." Plaintiff's Response, p. 15. Whipple's allegation about these extra duties is very vague. For example, in his deposition, he stated that he could not remember if Jones imposed extra duties on him "during either the promotion or the tenure process[.]" (DE 42-5, p. 118.) He then testified that "[a]fter the grievance was filed, there was a list of things [Jones] wanted me to do." *Id.*, pp.118-19. In his Statement of Genuine Issues, Whipple states that "Dr. Jones assigned Dr. Whipple extra work above and beyond Dr. Whipple's normal duties. At the time of Dr. Jones' extra assignment, it was already the 'busy season' of the Opera program and the additional work created needless hardship on Dr. Whipple, because of his responsibilities in connection to the upcoming performance of the opera The Majic Flute . . . ." (DE 56-1, p. 25.) Nowhere in these pleadings does Whipple explain just what these extra duties entailed. Instead, he merely asserts that Jones imposed some manner of extra work on him, apparently during a busy time when Whipple was working on the opera presentation. It is unclear if these extra duties

flowed from the removal of Robertson from the production and her replacement by Barber, or

whether these alleged additional duties were something else entirely. Either way, in support of

this contention, Whipple states as follows:

> The extra work assignment from Jones was a materially adverse job action
> because of its timing, because it imposed an undue burden on Dr. Whipple in the
> same way that adding 5 pounds to a 200 pound box of rocks would be an undue
> burden to someone carrying the box, even though adding the same weight to a 10
> pound box of rocks might not create any burden at all.

*Id*., pp. 15-16. Whipple's argument would be more convincing if it was supported by case law

rather than by a colorful metaphor. But as it stands, this argument is about as valuable as a box of

rocks. Not only does Whipple not explain what these additional duties were, but he presents no

evidence that they amounted to more than "a mere inconvenience or an alteration of job

responsibilities." Whipple presents only a vague assertion that Jones imposed extra duties that

Whipple found burdensome, but fails to show how those duties rise to the level of an actionable

adverse action, other than his claim that they imposed a "weighty" burden on him. This is

insufficient to give rise to an inference of retaliatory motive.

So, Whipple is left with the denial of tenure (and the concomitant termination of his

contract) as the sole basis to support his retaliation claim. Fortunately for him, that is sufficient to

survive summary judgment under the facts of this case. To understand why, the court begins with

a condensed time line of the relevant events leading up to Whipple's termination, especially since

Whipple relies heavily on what he characterizes as "suspicious timing" as proof of Taylor's

retaliatory motive. That time line is as follows:

1) November 5, 2010: Whipple files a written grievance with the University alleging

racial harassment by Robertson (DE 56-17);

2) February 28, 2011: Whipple writes to Bedi and Habecker appealing his promotion denial and raising complaints about race issues (DE 56-25);

3) June 30, 2011: Whipple writes to Habecker and others to voice several concerns, including issues related to race (DE 56-26);

4) October 7, 2011: Whipple files his first EEOC charge;

5) January 19, 2012: Whipple files a written grievance (raising many issues, including race issues) (DE 56-28);

6) January 31, 2012: Whipple files a written grievance objecting to his tenure review process (and again referencing race issues) (DE 42-6, p. 80);

7) February 28, 2012: Faculty tenure committee votes to deny Whipple's tenure application (DE 42-6, p. 81);

8) March 16, 2012: Harrison recommends denying tenure (DE 42-6, p. 83);

9) March 27, 2012: Whipple files a written grievance concerning his tenure review process and reiterating his concerns about racial discrimination and retaliation (DE 56-29); and,

10) July 30, 2012: Taylor President Habecker officially denies tenure and Whipple's employment is terminated (DE 42-3, p. 28).

Whipple argues that this time line is suspicious enough to raise a fact issue as to his retaliation claim. Plaintiff's Response, pp. 17-18.

Taylor's response to Whipple's suspicious timing argument is curious (and also completely unavailing). The University states that "[w]hen a retaliation claim is based on suspicious timing, 'the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act precedes the protected activity.'" Defendant's

Memorandum, p. 17 (quoting *Leitgan v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011)). Taylor then argues that "the evidence is conclusive that 'collegiality' stands as one of the key factors to be considered during the tenure review process and that Taylor raised Whipple's collegiality and student conflict resolution issues as early as 2008, well before he engaged in the alleged protected activity, *e.g.*, his formal harassment complaint against Robertson and the filing of Charge 1." *Id.* Taylor claims that since its proffered, nondiscriminatory reason for denying tenure, i.e., Whipple's collegiality issues ultimately did him in, was raised "as early as 2008," it preceded any formal harassment complaint that Whipple ever submitted. Taylor tiptoes around the time line of events set forth above. It merely argues that it had a legitimate, nondiscriminatory reason to deny tenure, and since that reason had its genesis before Whipple formally complained about race or retaliation issues, it somehow negates Whipple's suspicious timing theory. In other words, Taylor is attempting to recharacterize its proffered, nondiscriminatory explanation for not granting tenure as the "adverse action" that Whipple suffered, and that adverse action preceded any of Whipple's complaints about race discrimination. This argument is conceptually flawed, seeing as it puts the cart in front of the horse, but in the end it doesn't matter since the undisputed time line of events is sufficient to raise an inference of retaliation.

Throughout its briefs, Taylor consistently and adamantly maintains that race issues had nothing to do with its decision to deny Whipple's tenure application. Taylor presents a lot of evidence in support of its proffered, nondiscriminatory reason for that decision, only a portion of which is discussed in this opinion. And that evidence might well be enough to convince a jury. But only a jury, of course, can weigh the evidence and make the credibility determinations

necessary to decide whether Taylor's defense ultimately carries the day. For now, the only issue before the court is whether either of Whipple's claims withstand summary judgment.

The undisputed facts regarding the timing of Taylor's decision to deny tenure in relation to Whipple's complaints about racial harassment, together with additional evidence Whipple presents on the issue of pretext, when all reasonable inferences are drawn in favor of Whipple, are sufficient to move this case beyond the summary judgment stage. This is especially true when one focuses on the events that occurred between January 31, 2012, when Whipple complained of racially based discrimination, and Habecker's final decision in July to deny tenure. The temporal proximity between Whipple's complaints and the adverse employment event raises a genuine issue of material fact that precludes summary judgment.

In addition to his suspicious timing argument, Whipple punches at least a small hole in Taylor's proffered, nondiscriminatory reason for its decision by pointing out that he was "never disciplined for collegiality or trouble handling conflicts with students (or faculty)" even though Taylor maintains that those issues were the primary reason for its decision. Plaintiff's Response, p. 9. It is undisputed that Whipple was never disciplined for any alleged problems with collegiality or problems with students. All Taylor says about this undisputed fact is that "[l]ack of discipline is not a reason for granting tenure at Taylor." Defendant's Reply, p. 6. The court is not sure what this statement means, but it doesn't matter. In addition, Whipple claims that he "was in fact quite collegial," as evidenced by his "ability to inspire six colleagues, including ones from his own department, to [write] him letters of support for tenure . . . ." *Id.*, p. 11. (*See* DE 56-36, pp. 1-4, Letters of Recommendation.) Whether this evidence is sufficient to convince a jury that Taylor's proffered, nondiscriminatory reasons for its decision is pretextual remains to be seen.

But taken together, and drawing all reasonable inferences in favor of the nonmovant, the court concludes that Whipple has presented sufficient admissible evidence to withstand summary judgment.

A plaintiff can meet his burden on the issue of suspicious timing by using circumstantial evidence so long as that evidence presents "'a convincing mosaic . . .' [that] would permit a reasonable trier of fact to infer retaliation by the employer." *Castro v. Devry University Inc.*, 786 F.3d 559, 564-65 (7th Cir. 2015) (quoting *Rhodes*, 359 F.3d at 504). There are "three categories of circumstantial evidence available to a plaintiff using the 'convincing mosaic approach' to show unlawful retaliation." *Id*. At 565 (citing *Coleman v. Donahoe*, 667 F.3d at 860). These include: "(1) evidence of suspicious timing, (2) evidence that similarly situated employees were treated differently, and (3) evidence that the employer's proffered reason for the adverse employment action was pretextual." *Id*. Finally, "[e]ach category of circumstantial evidence can suffice by itself to preclude summary judgment, depending on its strength in relation to the other evidence, but plaintiffs may also use them together." *Id*. (citations omitted). When temporal proximity is one among several tiles in an evidentiary mosaic depicting retaliatory motive, however, "[s]uspicious timing . . . can sometimes raise an inference of a causal connection." *Magyar v. St. Joseph Regional Medical Center*, 544 F.3d 766, 772 (7th Cir. 2008); *see Scaife v. Cook County*, 446 F.3d 735, 742 (7th Cir. 2006) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is other evidence that supports the inference of a causal link.") (quoting *Lang v. Illinois Dep't of Children and Family Ser.*, 361 F.3d 416, 419 (7th Cir. 2004)). Determining "[w]hen the inference is appropriate cannot be resolved by a legal rule; the answer depends on context. . . . A

jury, not a judge, should decide whether the inference is appropriate." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011).

Whipple has presented evidence of suspicious timing and evidence that at least arguably calls into question Taylor's proffered, nondiscriminatory explanation for its decision to deny tenure. This might not be much, but it is sufficient to survive summary judgment.

The court is compelled to make some final remarks. Throughout this opinion the court has been highly critical of both parties' briefs. While the court certainly does not want to seem pedantic or be perceived as such (at least not to an undeserved degree!), it stands by its criticism, which is included to make two points: 1) the briefing in this case really was that bad; and, 2) it wasn't all the fault of the parties.

As to the first point, Whipple is represented by respected lawyers with decades of experience in employment cases and Taylor is represented by a venerable law firm. The court expects such experienced attorneys to submit stellar work product, and that did not happen in this case. The briefing on both sides was sloppy, cumbersome, disjointed, and often illogically constructed. The court has pointed out many of these problems in this opinion, and is hopeful that both sides will "up their game" from this point forward.

As to the second point, the court is mindful of the fact that both plaintiffs and defendants in employment discrimination cases are, to a great degree, almost forced to pack their pleadings with all manner of argument on a host of issues–some crucial, some less so, some immaterial, and some downright irrelevant. This is so because the analytical framework for resolving motions for summary judgment in these cases has become unduly burdensome to the parties and the courts. In fact, the Seventh Circuit took notice of this problem by acknowledging "the snarls and

knots that the current methodologies used in discrimination cases of all kinds have inflicted on courts and litigants alike." *Coleman v. Donahoe*, 667 F.3d at 862-63 (J. Wood, concurring). As Judge Wood wrote in her concurrence:

> Like a group of Mesopotamian scholars, we work hard to see if a "convincing mosaic" can be assembled that would point to the equivalent of the blatantly discriminatory statement. If we move on to the indirect method, we engage in an allemande worthy of the 16th century, carefully executing the first four steps of the dance for the *prima facie* case, shifting over to the partner for the "articulation" interlude, and then concluding with the examination of evidence of pretext.

*Id*. Litigants, no doubt, are equally frustrated with the requirements placed upon them by the *McDonnell Douglas* paradigm. This burden-shifting method requires both the plaintiff and the defendant to jump through all sorts of hoops when presenting or opposing a motion for summary judgment. For example, it is often not enough anymore for the parties in a discrimination case to argue about whether "similarly situated employees" were treated more favorably. Now, courts and litigants find themselves crawling around in the weeds arguing about "sub-issues," such as whether the "similarly situated" employees a plaintiff points to are even fair "comparators" in the first place. This does not serve as an excuse for lawyers to file briefs in federal court that contain improper citation form, careless grammatical errors, unnecessary and visually obnoxious typographical tricks, or illogical or irrelevant arguments; but it does help explain why parties often file such poorly written briefs. If the method of analysis is itself unduly cumbersome, the briefs will often reflect that characteristic. Judge Wood made a compelling (and entertaining) argument for modifying the analytical approach to these cases, if not retiring the *McDonnell Douglas* test altogether. But doing so is a task beyond this court's pay grade; and so until things change, courts and litigants are forced to engage in an "allemande" even though a simple box

step would benefit all.

## CONCLUSION

For the reasons set forth above, the Defendant's motion for summary judgment (DE 41) is: DENIED as to the issue of the timeliness of the Plaintiff's claims; GRANTED as to the Plaintiff's race discrimination claim; and DENIED as to the Plaintiff's retaliation claim. The Plaintiff's first motion to strike (DE 58) is MOOT; the Defendant's motion to strike (DE 61) is GRANTED in part and DENIED in part; and the Plaintiff's second motion to strike (DE 67) is MOOT.


Date: February 10, 2016.

/s/   William C. Lee
William C. Lee, Judge
United States District Court
Northern District of Indiana
